UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————

In the Matter of the Application/Action of

89 JPS, L.L.C.,

                    Petitioner-Plaintiff,

For an Order and Judgment Under CPLR
Article 78 and CPLR 3001

      -against-                         8:11-CV-181
                                           (NAM/DRH)

JOINT VILLAGE OF LAKE PLACID AND
TOWN OF NORTH ELBA REVIEW BOARD;
VILLAGE OF LAKE PLACID, INC.; TOWN
OF NORTH ELBA; CODE ENFORCEMENT
OFFICER OF VILLAGE OF LAKE PLACID
AND TOWN OF NORTH ELBA,

                  Respondents-Defendants.
———————————————————————

APPEARANCES:                 OF COUNSEL:

LAW OFFICE OF JAMES M. BROOKS      James M. Brooks. Esq.
72 Olympic Drive
Lake Placid, New York 12946
*Attorney for Petitioner-Plaintiff*

THORN GERSHON TYMANN
 AND BONANNI, L.L.P             Mandy McFarland, Esq.
8 Wembley Court, New Karner Road
P.O. Box 15054
Albany, New York 12212-5054
*Attorneys for Petitioner-Plaintiff*

RICE & AMON                 Terry Rice, Esq.
Four Executive Boulevard
Suite 100
Suffern, New York 10901
*Attorneys for Respondents-Defendant*s

**Norman A. Mordue, Chief U.S. District Judge**

MEMORANDUM-DECISION and ORDER

## I.      INTRODUCTION

      Plaintiff-Petitioner ("plaintiff") filed the instant proceeding in New York State Supreme

Court for Essex County alleging *inter alia* deprivation of his due process rights under the Fourteenth Amendment to the United States Constitution. The action also sought an order vacating an administrative determination of the Respondent-Defendant review board under N.Y. C.P.L.R. Article 78 and further relief under New York state law. Respondents-Defendants ("defendants") removed the action to this Court and immediately moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12 (b) (6).

Thereafter, plaintiff's counsel advised counsel for defendants that this Court lacked subject matter jurisdiction to entertain plaintiff's claims pursuant to N.Y. C.P.L.R. Article 78. Counsel for defendants contended that this Court does have appropriate jurisdiction over such claims and requested a conference with the assigned magistrate judge to resolve the issue. Magistrate Judge David R. Homer concluded that whether the Notice of Removal deprived the state court of jurisdiction to proceed on plaintiff's Article 78 claims was a matter for determination in the first instance by the state court. Defendants filed an appeal of Magistrate Judge Homer's Order arguing it is erroneous and contrary to law. Defendants requested entry of an Order stating that the state court is devoid of jurisdiction over any of plaintiff's claims and an injunction against Essex County Supreme Court prohibiting review of plaintiff's claims. Defendants further sought an order directing plaintiff not to proceed in state court on any of its claims.

Plaintiff then filed a cross-motion for remand of the first four causes of action to Essex County Supreme Court for lack of subject matter jurisdiction.

## II.    RELEVANT FACTUAL BACKGROUND

A.    History of Proceedings before the Administrative Review Board

This case involves plaintiff's application for a permitted accessory use building permit for a boathouse on Mirror Lake in Lake Placid, New York. The property in question is a vacant

commercial parcel that sits on Main Street in the Village of Lake Placid with unfinished apartments above. Plaintiff, who apparently is a developer and boat collector, submitted his application for a permit to construct a boathouse on the shoreline of the property on September 24, 2010 and presented it to the Joint Village of Lake Placid and Town of North Elba Review Board ("JRB") on October 6, 2010. Plaintiff's architect, William Kaufmann, offered testimony to the JRB concerning the proposed project which he estimated would cost $450,000. The proposed structure was a one story, 1050 square foot log faced boat house which was 20 feet wide, 32 feet deep with a maximum height of 13.75 feet, all dimensions which were expressly permitted by the then existing Land Use Code.[1] Mr. Kaufmann explained that plaintiff had presented the plans for the project to the Adirondack Park Agency ("APA") for required approval. Plaintiff had made modifications to the original plans - which called for a pitched roof - to provide for a flat roof in compliance with APA rules and was awaiting APA approval of the plans.

Mr. Kaufmann testified that the purpose of the boathouse was for dry boat slip and storage with a rear slip for an electric boat, also permitted by the pertinent Land Use Code. In particular, Mr. Kaufmann explained that one use for the structure was for the storage of two Maas single skulls, each 27 feet in length. At one point in the October 6, 2010, hearing, one of the Board members, Horst Weber, elected to recuse himself from further participation in determination of plaintiff's permit. Specifically, Mr. Weber indicated he had strong personal feelings against the construction of boathouses on Mirror Lake and was therefore apparently not in a position to judge the case fairly:

> If everyone has a boathouse on Mirror Lake you won't see much of
> the shoreline anymore. I mean going all the way around the lake.
> Fundamentally I'm against boathouses. I do not (in audible)[sic] so

---

[1]

The Court notes that though the Village of Lake Placid and Town of North Elba had plans to revise its Land Use Code to prohibit boat houses on Mirror Lake, the law in effect at the time plaintiff submitted his application permitted the construction of such structures.

> and then 32 feet into the lake for kayaks, I don't think is something
> that should be done to store a few kayaks.  So I, out of principle, have
> to abstain out of that project.  We shouldn't have any boathouses on
> Mirror Lake.

Subsequent to the initial hearing, plaintiff provided the JRB with the APA permit granted on

November 1, 2010, samples of all materials to be used in construction of the boathouse and a

color rendering of the proposed structure.

On November 3, 2010, the JRB convened and advised plaintiff that he was to proceed

with notifying neighbors within 200 feet of the proposed project so they could voice their

objections, if any.  Plaintiff was directed to mail 18 "Notices to Neighbors" as required by the

JRB procedure.  On November 8, 2010, three members of the JRB appeared at plaintiff's property

for a site inspection, including Mr. Weber who had previously recused himself.  The proposed

boathouse was staked out on shore and there was a buoy in the water representing the 32' length

that the boathouse would sit out into the lake.  The JRB members stood on the neighbor's dock to

see how their view would be affected.  They observed that the plaintiff's backyard was 69' wide

by 56' deep.

On November 17, 2010, the JRB met and allowed comment from the neighbors who

elected to appear and voice concerns over the proposed project.  16 of the 18 notices mailed had

been returned signed to the JRB.  Sarah and Mark Galvin, absentee owners of a neighboring

business, Bookstore Plus, and their tenant who rented the apartment above the commercial space,

appeared to voice their concern that the view of Whiteface Mountain, visible in the distance from

the backyard of the bookstore, might be impacted by the construction of the boathouse.  The

Galvins, however, did not present studies or comparisons of the relative heights of the proposed

structure, shoreline, and backyard of the bookstore.  William Hurley, Chairman of the JRB, noted

in the minutes of the November 17, 2010, meeting that the Board had received a letter from

Robert Evans who was "concerned" that the proposed boathouse would "affect the neighbor's

views" although the neighbor in question was not identified.  Hurley also acknowledged that the Board received two letters from the attorney for NBT Bank referencing the proposed changes to the Town and Village code which would prohibit boathouses on Mirror Lake and urged the JRB to deny plaintiff's application because the new code was scheduled to take effect in a little over forty days.

While he had recused himself at the initial hearing, Mr. Weber elected to make a statement on the record at the November 17, 2010, hearing which prompted an exchange between he and plaintiff's attorney, Mr. Brooks:

| | |
|---|---|
| Weber: | It would be an obstruction basically looking from the bookstore across Whiteface yes, that's what it would be.  Jim I did say at the last meeting I would abstain but I changed by mind I will vote on this.  So I'm allowed to make my comment right. |
| Brooks: | Well you abstained because you'd already previously expressed your opinion. |
| Weber: | Yeah. |
| Brooks: | And you candidly and honestly said you'd already formed your opinion and you couldn't be fair and imparital. |
| Weber: | Yeah. |
| Brooks: | ... participate your [sic] not supposed to.  I didn't make the rules those are rules that had been expressed before by courts. |
| Weber: | Yeah. |
| Brooks: | And if I can I'm not going to withdraw or allow you to withdraw your disqualification you already disqualified yourself and you should have. |
| Weber: | Can I change my mind? |
| Brooks: | No. |
| Weber: | I mean it's I can make a comment on it, it's |

Brooks:      You shouldn't be because you're a member of the board

Weber:       Yes.

Brooks:      You shouldn't be commenting on it.

Hurley:      Is it true Mr. Brooks that the only person that can recuse themselves or make that determination is the person themselves?

Brooks:      No I wouldn't go that far a Court can do that also and you did it yourself and I admired you for it of course as a matter of fact it was the right thing to do.

Weber:       Okay but I still will make a comment.

Brooks:      Well I do object to it because you shouldn't.

Weber:       Yeah okay because it

                                      ...

Weber:       It affects our whole community and I'm here on this board to adhere to the code because the code says we are in charge of making sure our community grows properly.   And we are taking care of our scenic resource.  So unless I would step off the board today I think boat houses in my book are visual pollution and that is general.  We have a lake shore that has been damaged already but with a project like this on Main Street we're going ever more in that direction.  So that is my last comment.

Following the exchange between Weber and Brooks, JRB Chairman Hurley stated on the record that although plaintiff had the right to have a boat house, Hurley "personally" thought the proposed structure was "too big for what he wants to do."  Although Hurley said what plaintiff had tried to do so far was "nice," is was "out of scale" with what "we should be looking at here on that part of the lake."  In response, Mr. Brooks argued that he did not believe that the Town and Village Code entitled the JRB to make that kind of determination "based on those standards."  Indeed, Mr. Brooks contended "[t]he fact that it interferes purportedly with one commercial property, you that's it."  JRB member Chip Bissell stated that the project would interfere with

"more than one" property.  When asked by Mr. Brooks to explain himself he said "I'm sure the next one down too.  This is sticking out a long way Jim. ... " Brooks countered that the next property down from plaintiff's was another commercial property and then Hurley piped in with "No, the Shahaddy's is a residence right on the lake."

Mr. Hurley then continued with a long narrative concerning the JRB's purpose in examining the need for plaintiff's proposed project:

> The question is do we have a right to look at need.  That is in the book under general development criteria.  The first one in the need of the proposed thing.  And I think that there are other solutions that this property, due to its configuration, due to its size of unused land space, can store boats in.  As I said you have a grass area so the upper deck here, if it was the only place they could use for sunning and laying out and or barbequing or enjoying the lake, I'd say ok.  But they have a seventy by fifty-five section of land that they can do all stuff on.  So do they have an explicit right.  They have a right.  But we do have other parcels of the code to consider and I just think this boat house in this location is too large for the general area.  And that is a consideration that we have to take into effect.  You have 300 feet of shoreline you can go out thirty-two feet.  With seventy feet of shoreline this will affect the neighbors not only their view but their enjoyment of their property also.

In response to Mr. Hurley's comments Mr. Brooks argued that his client "fully compli[ed] with all the requirements and standards of the code and he is entitled to his permit."  Mr. Brooks contended that "what [the JRB was] interposing on [plaintiff] or subjecting [him] to are personal opinion type determinations that are not recognized in [the] code and are not lawfully imposed on ... [plaintiff's] project."  When asked if plaintiff would consider making the boat house a little smaller, Mr. Brooks replied that plaintiff stated "No, that's what I need for what I intend to use it for."

Mr. Hurly then proposed closing the hearing and moving for a decision on the application, but at this point in the hearing, board member Mike Orticelle stated he would like to consult with the JRB counsel:

I'd like to talk to our attorney to find out exactly what it is, what our authority is, to get a legal opinion. I have a hard time telling people what their needs are, how to use their property in accordance with the law. I feel everybody's paying. I understand you know the site and the view are valuable around here but you cannot regulate community efficacy and good neighborliness. Those other boat houses you mentioned, those people drew those to that size for their purpose, to be good neighbors. This individual decided this is what he needs, this is what he wants, it's within the law. I have a hard time telling him otherwise unless there's something major about the way it's built, architecturally to control over it.

Based on Mr. Orticello's suggestion, Chairman Hurley's motion was tabled and consideration of the matter was adjourned.

When the JRB reconvened on December 1, 2010, its attorney, William Kissel, was present. He stated that there were three provisions of the Town and Village code which he relied on in advising the JRB in reviewing plaintiff's permit application. Kissel noted that despite the angst of the various board members who felt that they were required to either approve or deny the application as submitted, he advised that the code gave them the discretion and authority to approve the permit application with modification. Indeed, Kissel stated that the JRB would have to "set for the basis" for needing to modify the application and the "precise manner" in which the JRB would want to modify it. He then walked the board through the specific provisions of the code that he believed were applicable to review of plaintiff's permit application and advised the JRB about making findings of fact and a final determination.

Notably, although Mr. Kissel had never attended any of the previous JRB meetings concerning plaintiff's permit application, he stated that the chairman "went over with [him] a number of particular items that he was concerned about and thought the board was [concerned about]." Kissel also stated that the chairman asked him "to review the minutes" which he did. "So between those two processes" Kissel claimed that he "drafted some potential findings of fact." He also qualified the materials that the JRB had in front of them at the meeting stating that

they were given "analysis data that the planning office put together ... based on some field work

that they did."  Mr. Kissel stated:

> I did not see this until late in the day.  There's one reference in the
> draft stating that there are eight boat houses.  The chairman asked the
> question as to whether there's really eight boat houses.  So you know
> that number is not magic or my number, that number came from this.
> So again, as you discuss it with the staff or otherwise as you come to
> a different conclusion that's their finding of fact, not mine.

Mr. Brooks then asked for a copy of the factual or evidentiary materials Mr. Kissel was referring

to and was told by Mr. Hurley "Well we're this is our this is going to end up being our motion or

resolution.  So if we act on this you'll get a copy of it."  Mr. Brooks objected to not being

provided with a copy of the materials or even a chance to look at it as a violation of his client's

due process rights.

The board then proceeded to discuss the various Findings of Fact as drafted by attorney

Kissel.  It is clear from review of the transcript that the board could not quite agree on what the

definition of a boathouse was, what the dimensions and use of each of the structures on Mirror

Lake was and therefore how many boat houses were actually on Mirror Lake at the time it was

reviewing plaintiff's permit application.  Mr. Brooks objected a number of times to not being

provided with a copy of the findings of facts and other analytical data being discussed by the

board during the hearing but these objections were ignored.  Mr. Brooks also objected to Mr.

Weber's continued participation in the hearing after his official abstention from review of

plaintiff's permit application.  Mr. Kissel suggested that Brooks be allowed to reserve and state

his objections at the end of the hearing.  The balance of the discussion on the record concerned a

comparison of the relative size of the various structures or boat houses on the lake, the number of

feet each structure protruded into the lake and looking at each property where such a structure

existed, the percentage of existing shoreline taken up the structure.  These numbers were then

compared to the structure proposed by plaintiff.

Based on the comments made by members of the JRB on the record they seemed to be focusing on the fact that although the JRB had approved boat houses on the lake and there were additional boat houses on the lake which predated the code, plaintiff's proposed boat house was larger than any of these structures and took up more of the shoreline than any other existing shoreline structure on the lake.  To wit, plaintiff's proposed boat house would protrude four feet five inches further into the water than the next largest shoreline structure and his proposed boathouse would take up 29% of his property's shoreline whereas the other boat houses on Mirror Lake covered only between 4-23% of the lot shoreline of their respective properties.  The JRB did take express note of the fact that there were no other boat houses in the vicinity of the proposed project site.

When it became clear that the Board intended to approve plaintiff's permit application but with a modification that the boat house be no longer than 20 feet Chairman Hurley began asking each board member for his or her thoughts.  Though he had participated in the hearing, Mr. Weber noted once again that he had previously recused himself because he was "opinionated." Following this comment, however, another board member noted that Weber had only recused himself from voting on the original application as submitted.  Board member Chip Bissell stated "[t]his is a whole different idea.  This motion."  With that all members of the JRB, adopted the Criteria, Findings of Fact and Determination drafted by its counsel and voted in favor of approving plaintiff's application for a building permit to construct a boat house with a modification that it be no longer than 20 feet in length except Mr. Weber, who un-abstained and voted against the permit application.

B.      Overview of the JRB's Determination

The Criteria adopted by the JRB set forth the three sections of the Land Use Code relied on by the board in reviewing plaintiff's permit.  The first, Part IV, Article II, Section 4 entitled

"Site Plan Review" states that it's purpose is:

> to provide a process for the recognition and detailed evaluation of those types of natural and related land use considerations important to the achievement of the joint comprehensive plan and the purpose of these regulations and which, given the nature, level of detail and scale of the town wide inventory and zoning maps, require a more exact and site specific evaluation on a case by case basis than is otherwise possible.

Article II, Section 4A(4) states that the districts and lands containing and adjacent to Lake Placid and Mirror Lake are "an important and sensitive resource to the community, within which new uses or buildings of any size ... should undergo a site plan review."  Section 4(c) of Article II provides the procedure for site plan review and states that the JRB shall approve, approve with stipulated conditions, modification or disapprove any application based on its findings of fact and the "applicable development consideration set forth in appendix E, Part V" of the Code.

The second provision of the Code deemed relevant by the JRB's was Part IV, Article V, Section 3 which provided Site Design Guidelines applicable to projects within the Village of Lake Placid and the Town of North Elba.  Subsection 1 states "Buildings should be sited in such a manner that preserves existing landforms:"

> The building (s) must fit into the landscape in a way that leaves major landscape features intact.  The most prominent parts of the site must be left in their natural condition.  Construction must be scaled so that it complements rather than dominates the site.  On site simulation with balloons or other indicators may be required in order to adequately demonstrate true building scale.

Subsection 2 entitled "Siting must be compatible with representative building patterns" states:

> The existing community character is that of a traditional settlement with mixed uses and services, typically housed in contiguous buildings built over time on small compact lots with compatible architecture fronting on public sidewalks and streets.

Subsection 3 states "Avoid adverse impacts on nearby properties:"

> Relate the location of the site uses with adjoining and nearby properties to avoid conflicts caused by traffic, lighting or parking and

11

drainage, especially on residential properties.  Disturbance of existing vegetation must be minimized to allow existing buffers between properties to remain.

Finally, subsection 4, entitled "Buildings should be sited in a manner that preserves significant views" states:

> Primary concerns relate to maintaining views both to the site and features beyond.  Projects should be designed to that they complement rather than dominate the natural landscape.  Buildings should be sited so that their form does not break prominent skylines. ...

The JRB also included in the applicable Criteria a reference to Part IV, Article V to the following statement in Section 1concerning "architecture that is pleasing to observer, compliments adjacent and nearby structures and does not intrude upon or overwhelm the natural environment."  To wit, this provision of the Code reminds the board that "it is crucial to maintain a balance between development and the preservation of our visual appeal."  The inclusion of this fourth portion of the Code seemed to be in addition to the three relevant provisions Mr. Kissel had discussed at the JRB hearing on December 1, 2010.  The JRB's adoption of the language concerning the project's need to conform to specific architectural standards appears to contradict statements made by Mr. Kissel during the hearing regarding the applicability of architectural guidelines in the Code to plaintiff's project.[2]

---

[2]

Bissell:  The other point I'd like to make is that I feel that the boat house should have a connection architecturally to the existing building.  And I think it's it wouldn't be that hard to do but having a log boat house on the lake, use some of the beams and the feel of the Alpine Meadows building.  It seems like it would work much better than just having this completely different architecture behind it.  I think we talked about; it is talked about in code about not having the real Adirondack sort of feel like the C1 district on Main Street.  I think it's pretty clear in the code in our technical design guidelines.  It wouldn't be hard to do....

Krone:  But it's not on Main Street.

Bissell:  No it's not part of that building.  You know when you're going down the lake and you look at it, you know and I don't think it would be that hard to change.  You go from logs to a square cut.  It would not be difficult.
...
Kissel:  And in response to Mr. Bissell's comments I'd be a little cautious as your attorney saying that I find in the code for where this is and what it is, namely it's on the shore.  It's not

The final section of the Code referred to by the JRB in the Criteria adopted for review of plaintiff's permit was Appendix E entitled "Development Considerations." Specifically, the JRB referred to the General Development Considerations set forth in Section I of Appendix E and the Environmental/Natural Resource Considerations set forth in Section II of the Appendix.[3]

Subsequent to recitation of the pertinent Criteria applicable to its review of plaintiff's permit application, the JRB set forth its Findings of Fact. Though it appears these Findings were actually drafted by Mr. Kissel, they were ultimately adopted by the JRB with slight modifications as follows:

> 1.   Mirror Lake is protected by local laws/ordinances passed by the Village of Lake Placid/Town of North Elba that prohibit any motorized use of the lake except for electric propelled craft.
>
> 2.   Mirror Lake and its shores and views and vistas of it and across it are an important and significant natural resource of the Village of Lake Placid and Town of North Elba.
>
> 3.   The project site consists of a narrow waterfront lot that is 69

---

on Main Street. Excuse me, it's not a commercial building it's a boat house. ...

Kissel:   Excuse me. I believe it's personal use. Of course if it's not Mr. Chairman whether there was another application would be needed or not. But let's just say I know what you're talking about in terms of the architectural language in the code. I have trouble as your lawyer telling you that I find enough basis in it for you to change the architecture, in view of what you have now. That's not to say you could never touch the architecture but in terms of what's there and what the code says and what the rest of the community looks like in that area. I'm not saying you can't do it, I'm just saying I think you're getting on thin ice at that point.

[3]

At the hearing on December 1, 2010, Mr. Kissell highlighted a number of factors that the JRB would find applicable in its review of plaintiff's permit application under the "Development Considerations" section of the Code:

*   Appx E, Section I (A) (4) : The relationship of the proposal to the existing land use make-up and character of areas immediately or likely to be impacted by the proposal.
*   Appx. E, Section I (A) (5): The relationship of any principle and accessory building (s) and the proposed site to one another, structures and uses in the vicinity as well as to the natural features of the site.
*   Appx. E, Section I (A) (9): The overall sensitivity of the proposed project to the neighborhood and the site and its provision for the location, size and type of signage, lighting and landscape features.
*   Appx. E, Section II (A) (7): Scenic Views and Visual Considerations - Including scenic vistas, travel corridors, relationship between natural and built features and screening.

feet wide along the Mirror Lake waterfront.

4.     The shoreline of the project site at the waterline and into the lake of both the project site and all immediate and nearby properties is undeveloped and not improved by boathouses or any other structures, except for docks.

5.     There are no boathouses in the vicinity of the project site.

6.     The shoreline of the project site protrudes somewhat more into Mirror Lake than the properties immediately surrounding it on either side so that construction of a dock or a boathouse on the site will be somewhat more visible than if it were constructed on adjoining or nearby property.

7.     The entire shoreline of Mirror Lake is presently improved with only nine (9) boathouses and the length of all of these boathouses is less than the 32 foot length proposed by the applicant. The approximate dimensions of all existing boathouses on Mirror Lake and the lot size widths upon which these boathouses are located are shown in the attached analysis.

8.     The entire shoreline of Mirror Lake where the land touches the water is virtually free of all development with the exception of the boathouses referenced above, The Boathouse Restaurant owned by the Crowne Plaza and some small docks used for personal purposes of residents on the Lake.  There are no homes or structures other than the above described boathouses and docks that sit directly on the water or protrude into it.

9.     Mirror Lake and the project site are visible from several public areas within the Village of Lake Placid, including sections of Mirror Lake Drive, which contains 8 heavily utilized pedestrian walk-ways from which the project site can be seen. The project site is visible from large areas of the water and ice surface of Mirror Lake.  The entire surface of Mirror Lake is used year-round for recreational use, including canoeing, kayaking, sailing and swimming in the summer and walking, snowshoeing, cross-country skiing, skating and dogsled rides on the ice in the winter.

10.    The project site and the proposed boathouse will also be visible from portions of the Lake Placid Municipal Beach and Mids Park, the public park located between the shore of Mirror Lake and Main Street in Lake Placid.

11.    The board has reviewed the plans and application of the

14

applicant and has conducted an on-site visit of the premises and of nearby properties.  At the request of the board the applicant placed a floating buoy 32 feet from the shore of the project site in order to replicate the distance that would be occupied by the length of the boathouse that is proposed  by the applicant.  The board's site inspection of the project occurred while the buoy was in the water, allowing the board to review the potential visual impact of the boathouse from adjacent properties.

12. The joint review board has reviewed and approved three (3) boathouses ranging in building length from 18 feet 6 inches to 28 feet.

l3. The six (6) boathouses existing on Mirror Lake that were not subject to review and approval by the joint review board because they were preexisting are no longer than 27.7 feet in length.

13A. The existing boathouses on Mirror Lake, including those reviewed and approved by the Joint Review Board, occupy between 4% and 23% of the shoreline frontage of the properties on which they are located.  The proposed boathouse would occupy 29% of the shoreline frontage.

14. The length of the proposed boathouse is longer than any boathouse that has been approved in the past by the joint review board and is longer than the boathouses on Mirror Lake that were not subject to review by the joint review boord and because of its length is incompatible with the size and scale of existing boathouses on Mirror Lake.

15. Addressing Part IV, Article V, Section 3 A:

(l) The boathouse does not fit into the landscape in a way that leaves major landscape features intact and construction is not scaled so that it contemplates rather than dominates the site. In fact the length of the proposed boathouse results in it dominating the portion of the site at the lakeshore and substantially impairing if not eliminating the views from nearby properties of Whiteface Mountain and other peaks that are major existing landscape features. Construction has not been scaled so as to compliment rather than dominate the site as demonstrated by the buoy that was placed in the lake at the 32 foot point.

(2) The siting of the boathouse would not be compatible with representative building patterns in that it would extend into the

waters of Mirror Lake further than any existing boathouse.

(3)     There would be adverse impacts on nearby properties in that the views of Mirror Lake and Whiteface Mountain and other hills and peaks beyond will be totally or substantially obstructed from the adjoining properties owned by Galvin and Shehadi as will be the views of the lake and the mountain range beyond from the property owned by NBT Bank.

(4)     The building is not proposed to be sited in a manner that preserves significant views. Section 3 A (4) of the site design guide1ines states that "primary concerns relate to maintaining views both to the site and features beyond.  Projects should be designed so that they compliment rather than dominate the natural landscape. Buildings should be sited so that their form does not break prominent skylines."  Because of the length of the proposed boathouse it will impair views to the site and features beyond from the perspective of both adjoining and nearby properties and public areas from which the site and beyond are visible, including Mids Park, portions of the public beach, the surface of Mirror Lake and portions of Mirror or Lake Drive.  The design of the boathouse consisting of 32 feet in length would dominate rather than compliment the natural landscape and the 32 foot length of the boathouse will break the prominent skyline across and above the lake and of Whiteface Mountain and other peaks and mountains.

16.     Under Appendix E I A (4) the relationship of the proposed boathouse to the existing land use make-up and character of areas immediately or likely to be impacted by it reveals that it is inconsistent with the land use make-up and character of other boathouses on Mirror Lake because of its excessive length.  Similarly, under I A (5) the relationship of the proposed boathouse to structures and uses in the vicinity of it is one of inconsistency and incompatibility because of the excessive length.  Finally, under I A (9), the proposed boathouse is not sensitive to the neighborhood in that it is unduly intrusive on the structure-free nature of the neighborhood shore properties and the surfaces of Mirror Lake adjacent to those shores due to the excessive length of it.

17.     Additionally, under the criteria set forth in Appendix E II A (7), as discussed above, the scenic views to, across and beyond the site will be negatively impacted due to the length and width of the proposed boathouse.

18.     The negative impact and undue adverse impacts on the natural resources of the Village/Town and to the public areas and

adjacent and nearby properties identified above can be substantially reduced if the length of the boathouse does not exceed twenty (20) feet.

19.     At the meeting of the Joint Review Board held on November 17, 2010 the applicant's representative was asked by an adjoining property owner specifically whether the applicant "will be running business out of the boathouse." The app1icant's representative responded that the boathouse is part of the property and "he is developing his property." The applicant's representative also advised the adjoining land owner that the boathouse would be "part of a business." However, the application does not contain any information regarding intended business use of the boathouse and the applicant's representatiye did not provide the Board with any information regarding this potential use.

The JRB adopted the aforementioned Criteria and Findings of Fact by way of a resolution which all six members of the JRB voted, including Horst Weber, who voted against the resolution.  The remaining votes authorized plaintiff to build a boat house no longer than 20 feet in length on the further condition that it not be used for commercial purposes.

C.      Motions Currently Pending Before the Court

Plaintiff rejected the modification of his permit application by the JRB and sued in state court pursuant to Article 78 of N.Y. C.P.L.R. alleging that the JRB's action in conditioning his permit was arbitrary, capricious, unreasonable, illegal and in violation of lawful procedure. Plaintiff further alleged that Mr. Weber's participation in the various hearings related to his application and his subsequent vote on the project was an additional violation of C.P.L.R. Art. 78 because of Weber's initial abstention or recusal from the case based on personal bias.  Plaintiff sought a declaration that the JRB considered and relied on its purported "Findings of Fact" in an unlawful method and manner, in violation lawful process and procedure, by means which were arbitrary and capricious and in violation of plaintiff's rights to object, dispute or challenge such information in accordance with his due process rights under both the United States Constitution and the Land Use Code of the Village of Lake Placid and the Town of North Elba, New York.

17

Plaintiff seeks a further declaration that various provisions of the Land use Code at issue herein are unconstitutionally vague for failure to articulate objective, measurable standards.  Finally, plaintiff claims that his civil right of due process under the Fourteenth Amendment to the United States Constitution was violated by the JRB, the Village of Lake Placid and the Town of North Elba in denying him the permit he requested.

Defendants immediately removed the case to this Court and filed a motion to dismiss pursuant to Fed. R. Civ. P. 12 (b) (6) asserting that plaintiff's complaint fails to state any legally viable claims.  First, defendants stated that plaintiff had no property interest in the permit application he submitted to the JRB and was not deprived of due process of law.  Defendants contended that the decision of the JRB was supported by substantial evidence and was entirely appropriate.  Further, defendants argued that the Criteria objected to by plaintiff in the Land Use Code are not impermissibly vague.  Defendants submitted that plaintiff has failed to raise any viable claims against either of the municipal defendants.  Finally, defendants stated that Mr. Weber's participation in the proceedings did not alter the outcome.

Thereafter, plaintiff's counsel indicated to defense counsel that in spite of the Notice of Removal, they intended to continue litigating plaintiff's Article 78 claims in state court. Plaintiff's attorney argued that federal courts have no supplemental subject matter jurisdiction over such claims.  Defense counsel then sought an order from Magistrate Judge Homer declaring that plaintiff could not continue to litigate any part of the case in state court as the entire matter had been removed.  Following a telephone conference with the parties concerning this dispute, Magistrate Judge Homer issued an Order on March 11, 2011, in which he stated:

> It appears that the effect of the Notice of Removal on state court proceedings is a matter for determination in the first instance by the state court and therefore, if petitioner contends that it possesses a legal basis upon which to continue the Article 78 proceeding in state court notwithstanding the Notice of Removal, it may do so and the state court will determine if the Notice of Removal deprived it of

jurisdiction over that claim.

Defendants filed an appeal of this Order on March 17, 2011, and on March 21, 2011, plaintiff filed a motion to remand the claims filed under C.P.L.R. 78 to Essex County.

From a review of the parties' motion papers the Court learned that there had been motions pending in Essex County seeking similar, if not the same, relief sought herein in connection with the issue of whether a federal court may retain jurisdiction over plaintiff's Article 78 claims. Thus, the Court conducted a telephone conference on August 4, 2011, with all counsel to inquire as to the status of these motions in state court. The attorneys for the parties advised the Court that the state court had declined to make any determination on the motions pending before it prior to this Court deciding the motion for remand which is currently awaiting determination. The Court will consider the two motions and the appeal presently pending *seriatim*.

### III.    DISCUSSION

A.    Standard of Review

The standard applicable to motions to dismiss are well-settled. On a motion to dismiss pursuant to Fed. R. Civ. P. 12 (b) (6), the Court must accept the allegations of the complaint as true, and draw all reasonable inferences in favor of the nonmoving party. *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998); *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995). In addition, the Court may not dismiss the complaint unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Nettis v. Levitt*, 241 F.3d 186, 191 (2d Cir. 2001) (quotation omitted). Therefore, the issue before the Court on such a motion "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), courts focus primarily on the allegations in the complaint. *See Chambers v. Time Warner*, 282 F.3d 147, 152  (2d Cir. 2002).  However, if subject matter jurisdiction is contested, courts are permitted to look to materials outside the pleadings.  *See* F.R.C.P. 12 (b) (1); *Land v. Dollar*, 330 U.S. 731, 735 (1947); *see also St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 80–81 (2d Cir. 2005); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  Such materials can include documents appended to a notice of removal or a motion to remand that convey information essential to the court's jurisdictional analysis.  *Romano v. Kazacos,* 609 F.3d 512, 520 (2d Cir. 2010) (citations omitted).  Thus, while the Court has conducted an exhaustive review of the evidentiary record submitted by the parties, it has done so only for the purpose of determining the jurisdictional issues bearing on plaintiff's motion to remand.  The Court has not considered the additional evidentiary submissions in connection with defendants' motion to dismiss and has not converted the present motion to dismiss under Fed. R. Civ. P. 12 (b) (6) to one for summary judgment pursuant to Fed. R. Civ. P. 12 (d).

B.      Motion for Remand

Plaintiff contends that this Court has no subject matter jurisdiction over the claims in the complaint arising under N.Y. C.P.L.R. § 7801 and seeks remand of these causes of action to Essex County.  It is clear that the Court has no original subject matter jurisdiction over plaintiff's Article 78 claims, but plaintiff has raised a claim under the Fourteenth Amendment to the United States Constitution over which this Court exercises federal question jurisdiction pursuant to 28 U.S.C. § 1331.  Since the Article 78 claims arise out of the same facts as the denial of due process claim under the Fourteenth Amendment, this Court may exercise supplemental jurisdiction over these related claims arising under state law pursuant to 28 U.S.C. § 1367.  "A district court has supplemental jurisdiction over claims that are so related to a claim over which it has original

jurisdiction that it forms part of the same case or controversy." *Leonard v. Dutchess Co. Dept. of Health*, 105 F. Supp.2d 258, 261 (S.D.N.Y 2000) (citing 28 U.S.C. § 1367 (a)).  There are four circumstances under which supplemental jurisdiction may be declined:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  Indeed, the Second Circuit held in *Buric v. Kelly*, 157 Fed. Appx. 391, 394, 2005 WL 3310047, *3 (2d Cir. Dec. 6, 2005) that "a district court has discretion to decline supplemental jurisdiction **only** if its decision is based on one of the enumerated categories in 28 U.S.C. § 1367 (c)" (emphasis added).

In the present case, plaintiff's claims do not raise questions that are "novel or complex issues of state law."  Rather, the plaintiff's state and federal claims are based simply on the question whether the JRB violated the state law and procedure as well as plaintiff's federal due process rights in purporting to conduct an environmental review of his proposed project which, as a practical matter, consisted mostly of making a size and numbers comparison of his proposed boat house to others already existing on the lake.  The Court notes that although the JRB cited potential visual and environmental impacts of the proposed project in its Findings of Fact, the board did not rely on evidence by way of testimony, photographs or measurements to support its determination that these environmental or visual impacts would be significant given the congested and commercial nature of the vicinity surrounding plaintiff's property.  Given the location of plaintiff's property in a commercial area of the Village of Lake Placid and the provisions of the Land Use Code relied on by the JRB, the board was required to take into account the landscape, building patterns and character of the areas in the vicinity of or likely to be impacted by plaintiff's

21

project.  Indeed, the Court is particularly struck by the JRB's heavy reliance on the percentage of shoreline which plaintiff's proposed boat house would take up along Mirror Lake.  Clearly one would expect a boat house on plaintiff's lot which is smaller given its Main Street location to take up more shoreline area than boat houses built on larger lots more remote from the Village.  Thus, the question for a reviewing court is whether the JRB's focus primarily on measurements was an arbitrary method of reviewing plaintiff's project.

Moreover, it is clear that the JRB's Findings of Fact were not drafted solely as a result of testimony and evidence submitted during JRB hearings, but rather in large part as a result of analysis done by the board outside of the hearing process.  Plaintiff had no notice that the JRB was relying on purported facts or evidence developed outside of the hearing process, he was not provided with copies of JRB's Findings of Fact or comparative analysis data prior to the board making its determination and he had no opportunity to dispute or be heard on any of the factors relied on by the board in issuing a conditioned building permit.  In this Court's view, the administrative process, the evidence considered by the JRB and its ultimate determination in modifying plaintiff's proposal will not raise any unresolved or extremely significant questions of New York law.  The only issues for a reviewing court to decide will be whether the JRB's procedures were lawful, whether its determination was "affected by an error of law or was arbitrary and capricious or an abuse of discretion," *see* N.Y. C.P.L.R. § 7803 (3), and whether plaintiff's federal civil rights were violated.

The Court notes that the facts which support the claims under Article 78 are the same facts which give rise to plaintiff's federal claim of denial of due process rights.  Further, as this Court is already fully familiar with the record and briefs in this action, judicial economy would be served by all claims being decided in this forum.  Nevertheless, the remaining question under 28 U.S.C. § 1367 (a) is whether this Court will retain jurisdiction over any of plaintiff's federal

claims after review of the motion to dismiss pursuant to Fed. R. Civ. P. 12 (b) (6).  As discussed

below, the Court finds that each of plaintiff's federal claims must be dismissed, and plaintiff

obviously desires to litigate the state causes of action in Essex County.  Based thereupon, the

Court will exercise its discretion under 28 U.S.C. § 1367 (a) in declining to extend its

supplemental jurisdiction over plaintiff's state law claims.

C.      Motion for Dismissal

1.      Due Process

        Since plaintiff's complaint alleges facts which would support an alleged denial of both his

substantive and procedural due process rights, the Court will assume he intended to assert both

types of claims.

a.      Substantive Due Process

        At the outset, the Court is mindful of the Second Circuit's language in *Zahra v. Town of

Southold*, 48 F.3d 674, 679-80 (2d Cir. 1995), that "federal courts should not become zoning

boards of appeal to review nonconstitutional land[-]use determinations by the [C]ircuit's many

local legislative and administrative agencies."  However, in *Zahra*, the Circuit also noted

"Nevertheless, we have acknowledged that we should entertain such claims where a landowner's

constitutional rights are indeed infringed by local land-use actions."  *Id.* (citing *Brady v. Town of

Colchester*, 863 F.2d 205, 215 (2d Cir.1988)).  "In fact, in such an instance, "our duty to protect

the constitutional interest is clear."  *Id.* (citing *Sullivan v. Town of Salem*, 805 F.2d 81, 82 (2d Cir.

1988).

        Defendants contend that plaintiff's substantive due process claim is not viable because he

has no cognizable property interest in the building permit which is the subject of this action.

Indeed, to establish that defendants violated plaintiff's substantive due process rights, the Court

must first inquire "whether a constitutionally cognizable property interest is at stake."  *Villager

*Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995). The Second Circuit uses a strict "entitlement" test to determine whether a party's interest is protectable under the Fourteenth Amendment. *Zahra*, 48 F.3d at 680 (citing *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 192 (2d Cir. 1994); *RRI Realty Corp. v. Inc. Vill. of Southamptom*, 870 F.2d 911, 918 (2d Cir.), *cert. denied*, 493 U.S. 893 (1989); *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 58-59 (2d Cir. 1985). "This inquiry stems from the view that a property interest can sometimes exist in what is **sought** - in addition to the property interest that exists in what is **owned -** provided there is a 'legitimate claim of entitlement' to the benefit in question." *Id*. (emphasis in original) (citing *RRI Realty*, 870 F.2d at 915; *Yale Auto Parts*, 758 F.2d at 58.) "The analysis focuses on the extent to which the deciding authority may exercise discretion in arriving at a decision, rather than on an estimate of the probability that the authority will make a specific decision." *Id*. (citing, e.g., *Walz v. Town of Smithtown*, 46 F.3d 162, 168 (2d Cir. 1995) (homeowner had property interest in an excavation permit because superintendent of highways had no discretion to decline to issue it if the application stated the nature, location, extent and purpose of the proposed excavations); *Gagliardi*, 18 F.3d at 192-93 (landowners had no property interest in enforcement of zoning laws for adjacent property, since municipal officials had broad discretion in determining whether to grant or deny building permit, site plan and variances); *RRI Realty*, 870 F.2d at 918-19 (no property interest existed in building permit because town officials had discretion to either grant or deny the permit).

  In the present case, the Court notes that pursuant to Site Plan Review provision of the Land Use Code at issue herein, the defendant JRB had the discretion to "approve, approve with stipulated conditions, modification or disapprove any application" presented. Thus, it would appear that plaintiff had no constitutionally protected property interest in the building permit he sought for the boat house. Plaintiff argues nevertheless that the "strict entitlement" test is not

applicable to this case because here, the JRB did not simply exercise its discretion and deny his

permit application.  Rather, plaintiff contends that the JRB granted his building permit, thus

vesting him with a property right.  While it is true that the JRB granted plaintiff's permit, it did so

with conditions which it clearly had discretion to do at the time the permit was granted.  To

establish a valid "property interest" for due process consideration, a plaintiff must show that the

benefit or property deprived was entitled to constitutional protection "at the time he was deprived

of that benefit."  *Zahra*, 48 F.3d at 680 (citing *Brady*, 863 F.2d at 211-12 (balance of citations

omitted).  In this case, it is apparent that the granting of a conditioned permit **is** the deprivation at

the heart of plaintiff's claims.  Thus, plaintiff's substantive due process claim is fatally flawed for

want of a constitutionally protected property interest.

b.      Procedural Due Process

In order to establish a procedural due process violation, a plaintiff must prove that he or

she was deprived of " 'an **opportunity** ... granted at a meaningful time and in a meaningful

manner' for [a] hearing appropriate to the nature of the case."  *Brady,* 863 F.2d at 211 (quoting

*Boddie v. Connecticut*, 401 U.S. 371, 378 (1971) (emphasis in original).  Here, defendants argue

that the availability of Article 78 administrative review of the JRB's determination and procedural

process under state law precludes a finding that the defendants' conduct violated plaintiff's rights

of procedural due process under the Fourteenth Amendment.  The Court agrees.  Plaintiff's

"procedural due process" claims are these: 1) Weber's participation and vote in the JRB review of

his permit application was unlawful based on his admitted bias concerning the subject matter of

boat houses on Mirror Lake; and 2) the JRB violated the law by relying on evidence and

documents which were not shared with plaintiff's counsel prior to the board's determination and

which plaintiff had no opportunity to refute or oppose.  With respect to the JRB's Findings of

Fact, many of which are conclusory, particularly with respect to potential environmental impacts

25

of the project, plaintiff asserts they were illegally and improperly presented by the board.

Because plaintiff can pursue these claims by means of an adequate postdeprivation remedy in the

state courts, he has failed to allege a federal constitutional violation. *See Hellenic Am.*

*Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 882 (2d Cir. 1996) (there is no

constitutional violation when there is an adequate state postdeprivation procedure to remedy a

random or arbitrary deprivation of property or liberty) (citing *Hudson v. Palmer*, 468 U.S. 517,

533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 541 (1981), overruled on other grounds by *Daniels*

*v. Williams*, 474 U.S. 327 (1986)).

c.      Void for Vagueness Challenge

        Plaintiff's alleges that the site design guidelines set forth in the Land Use Code used by

the JRB to review plaintiff's proposed project are "unconstitutional" because they fail to provide

"meaningful standards" for the board to use in making determinations.  Although not couched

expressly as a federal claim, the Court interprets this "void for vagueness" challenge as also

arising under the Fourteenth Amendment to the federal Constitution.  Indeed, the vagueness

doctrine voids on due process grounds a rule that contains "prohibitions [that] are not clearly

defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  "The need for notice is at the

heart of the vagueness doctrine." *Kramer v. New York City Bd. of Educ*., 715 F. Supp.2d 335, 356

(E.D.N.Y. 2010).  A punitive enactment is unconstitutionally vague when it (1) does not allow a

person of ordinary intelligence a reasonable opportunity to know what is prohibited, or (2) lacks

explicit standards, thus permitting arbitrary or discriminatory enforcement. *See Grayned*, 408

U.S. at 108-09; *see also Farid v. Ellen*, 593 F.3d 233, 240 (2d Cir. 2010).  A statute or rule is

inadequate under the second criterion when it "fails to provide sufficiently explicit standards for

those who apply it," and "impermissibly delegates basic policy matters ... for resolution on an ad

hoc and subjective basis." *Id.* at 243.

Plaintiff's ability to raise this claim in federal court, however, is compromised by his lack of standing.  Standing requires that: (1) the party suffer an actual or imminent "injury in fact" that is "concrete and particularized"; (2) there is a causal connection between this injury and that conduct of the defendants; and (3) that the injury can be redressed by a favorable decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  As referenced above, however, plaintiff did not have a legally cognizable property interest in having his application for a building permit granted.  Thus, he did not suffer an "injury in fact" as a result of the alleged vagueness in the Land Use Code and lacks standing to challenge its constitutionality in federal court.

d.      State Law Claims

Defendants also seek dismissal of plaintiff's state law claims, including those raised pursuant to C.P.L.R. Article 78.  Because the Court has determined that it does not have original jurisdiction over any of plaintiff's federal claims, however, the Court will decline to determine the merits of plaintiff's state law claims pursuant to its supplemental jurisdiction.  In lieu of dismissing these claims without prejudice, the Court deems remand appropriate.

D.      Appeal of Magistrate Judge's Determination

The Court has reviewed the record and docket concerning defendants' appeal of Magistrate Judge Homer's determination to allow plaintiff to attempt to continue litigating his Article 78 claims in Essex County Supreme Court in spite of the Notice of Removal filed February 16, 2011.  Since the state court was awaiting a determination by this Court, however, on plaintiff's motion for remand before proceeding with the various motions presented by the parties in Essex County, it seems Magistrate Judge Homer's determination on this matter was a nullity.  To wit, Magistrate Judge Homer's refusal to issue an order declaring that this Court had exclusive jurisdiction over all aspects of plaintiff's claims did not alter the rights or status of any party herein.  Based thereupon, and in particular view of this Court's determination to remand

27

plaintiff's state law claims, the Court finds it unnecessary to analyze the merits of defendants'

appeal of the Magistrate Judge's determination.

## IV.    CONCLUSION

Based on the foregoing, it is therefore

ORDERED that defendants' motion to dismiss the Fifth Cause of Action in the complaint

which asserts violations of substantive and procedural due process pursuant to Fed. R. Civ. P. 12

(b) (6) is GRANTED; and it is further

ORDERED that to the extent that plaintiff's complaint may be deemed to include a "void

for vagueness" challenge arising under federal law it is also dismissed; and it is further

ORDERED that defendants' motion to dismiss the state law claims in plaintiff's complaint

pursuant to Fed. R. Civ. P. 12 (b) (6) is DENIED; and it is further

ORDERED that plaintiff's motion to remand the causes of action arising under state law

to Supreme Court, Essex County is GRANTED; and it is further

ORDERED that defendants' appeal of Magistrate Judge Homer's determination of March

10, 2011, is DENIED as moot and unnecessary.

IT IS SO ORDERED.

Date:    September 14, 2011
         Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge